UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JAMES CUSHMAN, an individual, | ) | CV 08-5284 SVW (CTx) |
| | ) | |
| Plaintiff, | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW [JS-6] |
| v. | ) | |
| | ) | |
| | ) | |
| MOTOR CAR DEALERS SERVICES, INC.; | ) | |
| AMERICAN FIDELITY ASSURANCE | ) | |
| COMPANY; DOES 1 through 10, | ) | |
| inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**I.   INTRODUCTION**

Plaintiff James Cushman ("Plaintiff") brings this action pursuant
to 29 U.S.C. § 1132(a)(1)(B), to recover benefits under the terms of an
ERISA plan.  In July of 2005, Plaintiff left his job at a car
dealership and began receiving disability benefits from Defendant

American Fidelity Assurance Company ("Defendant").[1]  In March of 2008, Defendant decided that Plaintiff no longer qualified for benefits because Plaintiff could perform sedentary work.  As a result, Defendant terminated Plaintiff's benefits under the long-term benefit plan (the "Plan").  Having conducted a bench trial on February 10, 2009, the Court now makes the following findings of facts and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.  For the reasons that follow, the Court finds that Defendant abused its discretion by deciding to terminate Plaintiff's long-term benefits under the Plan.

**II.  FACTS**

On July 26, 2005, Plaintiff filled out and submitted to Defendant a disability application, which stated that Plaintiff was experiencing "pain in feet [and] lower back." (Administrative Record ("AR"), at 311.)  Plaintiff wrote in the application that he had been injured moving some suitcases and, ever since, had been experiencing pain in his back and his feet.  (Id.)

Upon receipt of Plaintiff's disability application, Defendant began paying Plaintiff's benefits nearly immediately.  (See id. at 25.)  Over the next two and a half years, Defendant paid Plaintiff for his disability benefits in the amount of approximately $6,000.00 per month.  (Id.)

---

[1] Defendant Motor Car Dealers Services, Inc. has not responded to the Complaint, nor otherwise made an appearance in this case.

In July of 2007, Defendant arranged for Plaintiff to be examined by a doctor in order to determine whether Plaintiff could return to work. (Id. at 454.) On August 7, 2007, Plaintiff met with Dr. Robert Shorr. (Id.) Dr. Shorr noted that Plaintiff's chief complaints were for "bilateral foot pain and edema." (Id.) Dr. Shorr noted that Plaintiff's main symptoms were constant pins and needles sensations in both feet, and that his feet were often cold, making sleep difficult. (Id. at 455.) Plaintiff also reported bilateral foot pain and pain in his left hip while ambulating. (Id.) Dr. Shorr noted that Plaintiff was walking with a cane. (Id.)

Dr. Shorr performed a physical examination of Plaintiff, which noted no tenderness in Plaintiff's back, and full range of motion in the lumbar spine. (Id. at 456.) Dr. Shorr found edema in both ankles and a "mild tremor" in the outstretched upper extremities. (Id.) Dr. Shorr also noted that Plaintiff's posture was normal in both sitting and standing positions, and that, although he walked with a cane, he rose easily from a chair. (Id. at 458.)

Dr. Shorr's report surveyed Plaintiff's past medical history at length. (Id.) Dr. Shorr noted Plaintiff's visits with Dr. Kuhlman in 2005, who reported that Plaintiff was having trouble ambulating, and who requested that x-rays be taken of Plaintiff's lower back, as well as a neurological consultation and referral to a physical therapist. (Id. at 459.) Dr. Kuhlman also noted that Plaintiff "needs to take a lot of pain medications," apparently to treat Plaintiff's low back pain and "bilateral foot pain." (Id.) Dr. Shorr's report also noted a visit to Dr. Verpukhovskiy in 2005, who reported that Plaintiff had "pain in his feet and forelegs, with numbness, and pins and needles

sensations." (Id. at 460.)  In January of 2006, Plaintiff was seen by Dr. Javaherian, who reported that Plaintiff suffered from "lower extremity edema and pain." (Id. at 462.)  Dr. Javaherian referred Plaintiff to orthopedics for evaluation of Plaintiff's back and foot pain. (Id. at 463.)  Dr. Shorr also noted a 2006 visit to Dr. Cordero, who stated that Plaintiff had "back and lower extremity pain." (Id. at 464.)  Later in 2006, Dr. Cordero had reported that Plaintiff responded well to some medication, but that Plaintiff "continues to have pain in his legs." (Id. at 465.)

After recounting Plaintiff's extensive medical history, Dr. Shorr made his findings.  Dr. Shorr found that Plaintiff had "developed what appears to be a polyneuropathy of unknown etiology." (Id. at 466.) Dr. Shorr wrote that he did not know the reason for Plaintiff's lower extremity edema and polyneuropathy. (Id.)  Moreover, he noted:

It is not clear whether the condition is stable or worsening. From a medical standpoint, the patient definitely has not been fully evaluated or treated for his condition and this limits my ability to comment on disability issues.  A thorough neurological evaluation with EMG and nerve conduction studies, CSF analysis, and other laboratory work would be necessary.  At this point, there still is no diagnosis and my comments are based only on the physical findings and record review.

(Id.)  Despite this somewhat inconclusive finding, Dr. Shorr opined in the very next sentence that "[a]t this time, the patient can do only sedentary work, that is, work in a sitting position, requiring the use only of his upper extremities." (Id. at 467.)

Defendant also sent Plaintiff's medical files to Dr. Caroline Mason for review. (<u>Id.</u> at 470.) Dr. Mason did not perform a physical examination of Plaintiff, but she submitted a report dated February 19, 2008. (<u>Id.</u>) As part of Dr. Mason's evaluation, she attempted to contact Plaintiff's treating doctors. (<u>Id.</u>) She was unable to contact Dr. Javaherian, who was apparently no longer with the practice. (<u>Id.</u>) Dr. Mason did talk to Dr. Cordero, however, who was Plaintiff's current treating physician at the time. (<u>Id.</u> at 471.) Dr. Cordero reported that he had seen Plaintiff about a week earlier and that his physical condition had not changed. (<u>Id.</u>) Dr. Cordero informed Dr. Mason that Plaintiff continued to report bilateral foot pain and "3-4+ pitting edema in both ankles." (<u>Id.</u>) Dr. Cordero further reported that Plaintiff appeared sedated, and Dr. Cordero expressed his concern with Plaintiff's use of pain medication. (<u>Id.</u>) Dr. Cordero said that Plaintiff reported too much pain to work even at a sedentary job. (<u>Id.</u>)

After reviewing Plaintiff's medical history, Dr. Mason found that Plaintiff was positive for leg edema. (<u>Id.</u> at 473.) Dr. Mason also noted that Plaintiff reported too much foot pain to work at a sedentary job. (<u>Id.</u>) Nonetheless, Dr. Mason stated that, in her opinion, Plaintiff could work in a sedentary position. (<u>Id.</u>) Dr. Mason went on to opine that Plaintiff could "start work in a sedentary position at four hours a day increasing two hours a day every two weeks until he is working at eight hours a day." (<u>Id.</u>) Dr. Mason said that he would not be able to stand or walk for more than 20 to 30 minutes without resting, and would be able to lift up to 25 pounds up to two times per hour. (<u>Id.</u>)

5

Based on the opinions of Dr. Shorr and Dr. Mason, Defendant terminated Plaintiff's long-term benefits on March 12, 2008. (Id. at 388.)  In the letter, Defendant stated that, based on the independent medical reviews, Plaintiff could work in a sedentary position and was thus not unable to perform "any occupation." (Id.)  Defendant provided Plaintiff with one final benefit check for $12,000.00. (Id.)

On April 16, 2008, Plaintiff's counsel notified Defendant that Plaintiff was appealing Defendant's decision to terminate his benefits. (Id. at 321.)  A few weeks later, however, on May 23, 2008, Plaintiff's counsel sent Defendant another letter asking Defendant to "[p]lease wait a few more weeks before you make a decision in this matter so we can see what is happening with the sleep apnea issue." (Id. at 314.) Plaintiff apparently thought he might obtain results from further testing that could affect the outcome of the appeal. (Id.)  Then, on June 12, 2008, Plaintiff's counsel sent Defendant another letter stating that, rather than waiting for the sleep apnea results, Plaintiff would like Defendant to begin reviewing his termination immediately. (Id. at 312.)  Plaintiff's counsel warned that Defendant only had forty-five days under ERISA regulations to make a determination. (Id.)  Sixty days later, on August 12, 2008, Plaintiff filed this lawsuit alleging a violation of ERISA.  Defendant still has not made a decision on Plaintiff's appeal.

///
///
///
///
///

III.  ANALYSIS

   A.  Standard of Review

   As an initial matter, the Court must determine what standard of review should be applied to Defendant's decision to terminate Plaintiff's benefits.  The default standard of review applicable to a plan administrator's decision to deny benefits is de novo.  <u>Abatie v. Alta Health & Life Ins. Co.</u>, 458 F.3d 955, 963 (9th Cir. 2006).  If the plan unambiguously gives the plan administrator discretion to determine a plan participant's eligibility for benefits, however, then the standard of review shifts to abuse of discretion.  <u>Id.</u>

   Here, the Plan gives the administrator "full discretion and authority to determine the benefits and amounts payable and to construe and interpret all terms and provisions of the plan." (AR, at 30.) Thus, it would appear that Defendant's decision to terminate Plaintiff's benefits should be reviewed for abuse of discretion.

   In <u>Abatie</u>, however, the Ninth Circuit held that procedural irregularities should be taken into consideration when reviewing a denial of benefits that would otherwise be reviewed under an abuse of discretion standard.  <u>See</u> 458 F.3d at 971.  The court said that an administrator's decision to deny benefits should be reviewed de novo if "an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA, and thus acts in utter disregard of the underlying purpose of the plan as well." <u>Id.</u>  The court reasoned that under <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101 (1989), a plan administrator's decision is only entitled to deference to the

1    extent that the administrator actually exercises discretion.  Id.
2    Thus, under some circumstances, "when a plan administrator's actions
3    fall so far outside the strictures of ERISA that it cannot be said that
4    the administrator exercised the discretion that ERISA and the ERISA
5    plan grant, no deference is warranted."  Id. at 972.  The court
6    cautioned, however, that such de novo review is only be appropriate in
7    a "rare class of cases," and "a procedural irregularity in processing
8    an ERISA claim does not usually justify de novo review."  Id.

9        Despite the fact that a procedural irregularity will not often
10   warrant de novo review, the court noted that "[a] procedural
11   irregularity, like a conflict of interest, is a matter to be weighed in
12   deciding whether an administrator's decision was an abuse of
13   discretion."  Id.  Earlier in its opinion in Abatie, the Ninth Circuit
14   said that courts should apply an abuse of discretion review "tempered
15   by skepticism commensurate with the plan administrator's conflict of
16   interest," when evaluating a denial of benefits.  Id. at 959.  Applying
17   the same framework to procedural irregularities, the court said that
18   "[w]hen an administrator can show that it has engaged in an ongoing,
19   good faith exchange of information between the administrator and the
20   claimant, the court should give the administrator's decision broad
21   deference notwithstanding a minor irregularity."  Id. at 972.  By
22   contrast, however, "[a] more serious procedural irregularity may weigh
23   more heavily."  Id.

24       The Ninth Circuit also made clear that when a plan administrator
25   has failed to follow a procedural requirement of ERISA, the court can
26   consider evidence outside of the administrative record.  Id. at 973.
27   The court noted that under de novo review, "the court is not limited to

28

the administrative record and may take additional evidence." Id.   In
addition, however, "[e]ven when procedural irregularities are smaller,
. . . and abuse of discretion review applies, the court may take
additional evidence when the irregularities have prevented full
development of the administrative record." Id.   In so doing, the goal
is to "in essence, recreate what the administrative record would have
been had the procedure been correct." Id.

      Although Abatie provides the relevant framework, the parties
initially look to two pre-Abatie cases for guidance on the applicable
standard of review.  First, Plaintiff cites to Jebian v. Hewlett-
Packard Co. Employee Benefits Organization Income Protection Plan, 349
F.3d 1098 (9th Cir. 2003).  In Jebian, the plan provided that if the
administrator did not respond to the claimant's appeal within sixty
days, the "claim shall be deemed to have been denied on review." Id.
at 1102.  The applicable regulation at the time also stated that if the
appeal was not decided within sixty days, the appeal was "deemed
denied." Id. at 1103.  The Ninth Circuit held that "where, according
to plan and regulatory language, a claim is 'deemed . . . denied' on
review after the expiration of a given time period, there is no
opportunity for the exercise of discretion and the denial is usually to
be reviewed de novo." Id.[2]

_____

[2] In Jebian, the Ninth Circuit relied heavily on the Tenth Circuit
case Gilbertson v. Allied Signal, Inc., 328 F.3d 625 (10th Cir.
2003).  Much like Jebian, the court in Gilbertson applied a de novo
standard of review because the plan contained a deemed denied clause,
and the applicable regulation at the time said that an appeal would
be deemed denied if a ruling was not made on the appeal within sixty
days.  Id. at 628-29.  The court held that "[w]hen the administrator
fails to exercise his discretion within the required timeframe, the
reviewing court must apply Firestone's default de novo standard."
Id. at 631-32.

Plaintiff argues that the rule from Jebian should apply here, and that, since Defendant has not made a decision on Plaintiff's appeal within the applicable forty-five day limit, Plaintiff's appeal should be deemed denied, and de novo review should apply.  This case is distinguishable from Jebian, however, in two important ways.  First, the Plan at issue in this case does not contain a deemed denied clause like the plan did in Jebian.  This is a critical distinction because, in Jebian, the court relied primarily on the fact that the plan itself contained the deemed denied language, and therefore, the administrator could not claim to have exercised discretion in light of such an automatic denial.  See id. at 1106 n.6.  Second, the regulation at issue in Jebian has since been amended such that it no longer includes the deemed denied language.  Now the regulation simply states that if the plan administrator has not issued a decision within the required time, then "a claimant shall be deemed to have exhausted the administrative remedies available under the plan."  29 C.F.R. § 2560.503-1(l).  This revised language allows a plaintiff to bring suit in federal court if a decision is not issued on the appeal within forty-five days, but the regulation no longer provides that the claim is automatically denied.  Given these two important differences, Jebian is not directly on point.

Indeed, in the second case cited by the parties, Gatti v. Reliance Standard Life Ins. Co., 415 F.3d 978 (9th Cir. 2005), the Ninth Circuit subsequently distinguished the court's ruling in Jebian on similar grounds.  In Gatti, the plan did not contain a "deemed denied" clause like the one included in the plan in Jebian.  Id. at 982.  Moreover, the court noted that the applicable regulation was amended after the

court's decision in <u>Jebian</u> to eliminate the "deemed denied" language. <u>Id.</u> at 984 (citing 29 C.F.R. § 2560.503-1(l)).  Although the plan administrator's decision was rendered after the applicable time limit, the court noted that the administrator had actually denied the claim on appeal.  <u>See id.</u>  As a result, the court noted that this ultimate denial on appeal was "an act of discretion," and applied the abuse of discretion standard.  <u>See id.</u>  Thus, unlike <u>Jebian</u>, where the claim was automatically denied by virtue of the deemed denied clause, and no discretion was actually exercised, in <u>Gatti</u>, the administrator had actually exercised its discretion when denying the claim even though the denial was not timely.[3]

The Ninth Circuit then addressed whether the procedural violations at issue in <u>Gatti</u>, primarily a late decision on the plaintiff's administrative appeal, could influence the standard of review.  <u>See id.</u> The court referred to its earlier decision in <u>Blau v. Del Monte Corp.</u>, 748 F.2d 1348 (9th Cir. 1984), where the court had applied a heightened standard of review in light of the administrator's procedural irregularities.  <u>Id.</u>  In <u>Gatti</u>, the Ninth Circuit noted that "it was the 'wholesale and flagrant' nature of the benefits administrator's violations that caused the panel [in <u>Blau</u>] to decide that the

---

[3] The Ninth Circuit also addressed a deemed denial situation in <u>Lamantia v. Voluntary Plan Administrators, Inc.</u>, 401 F.3d 1114 (9th Cir. 2005).  There, much like <u>Jebian</u>, the plan expressly contained a deemed denied clause, and the plan administrator had not ruled on the plaintiff's appeal within the requisite time limit.  <u>Id.</u> at 1116-17. The Ninth Circuit refused to apply a de novo standard of review because there was a good faith exchange of information, and it was actually the plaintiff who was responsible for not submitting the requisite information in order to allow the claims administrator to make a timely decision.  <u>Id.</u> at 1123.  As discussed <u>infra</u>, however, the Court finds that no such similar good faith exchange of information occurred here.

violations altered the substantive relationship between the employer and employee such that ERISA's purposes were defeated." Id. at 985. The court in Gatti found Blau inapplicable, however, because the administrator's late denial of the appeal was simply a "technical violation." Id. The court said that "[i]t would be inconsistent with the opinion in Blau to alter the standard of review on the basis of technical violations of ERISA's requirements." Id. Thus, the court declined to apply a de novo standard of review, and instead, reviewed the denial of the plaintiff's appeal for abuse of discretion. Id.

Gatti is similar in some respects to this case because, here, neither the Plan nor the applicable regulation contain the deemed denied language that was included in the plan in Jebian. One important distinction, however, is that in Gatti, the administrator simply issued its denial of the plaintiff's appeal late, whereas here, Defendant has never issued a decision on Plaintiff's appeal. The fact that the administrator issued a late denial was important in Gatti, because by issuing that denial, even though it was late, the Ninth Circuit found that the administrator had actually exercised its discretion with respect to the appeal. Here, however, since there has not yet been a decision on Plaintiff's appeal, Defendant has not yet exercised its discretion with respect to the appeal. Furthermore, the procedural irregularity at issue in his case is more significant than the issuance of a late decision in Gatti, which was merely a "technical violation." Here, Defendant has completely ignored Plaintiff's appeal for more than a year. Thus, although this case is similar in some respects to Gatti, this case is also distinguishable from Gatti in important ways.

As the foregoing discussion illustrates, neither <u>Gatti</u> nor <u>Jebian</u> is directly on point here.  Thus, the Court must return to <u>Abatie</u> and determine what standard of review applies.  In <u>Abatie</u>, the Ninth Circuit said that de novo review was appropriate in a "rare class of cases" where "an administrator engages in wholesale and flagrant violations of the procedural requirements of ERISA."  458 F.3d at 971.  As an example of such wholesale and flagrant violations, like in <u>Gatti</u>, the Ninth Circuit in <u>Abatie</u> again cited <u>Blau</u>.  <u>Id.</u>

In <u>Blau</u>, the defendant company purchased another company in 1966, but for more than a decade, the employees of the purchased company were not informed that they were eligible for benefits under the defendant company's pension and benefit plans.  <u>See</u> 748 F.2d at 1350.  The defendant did not publish the policy or otherwise inform the employees of its existence, contents, or terms.  <u>Id.</u> at 1351.  Instead, the plan was kept secret and only corporate officers and corporate employee staff had access to the plan document.  <u>Id.</u>  By keeping the plan concealed from the employees, the court found that the plan administrator violated ERISA's "reporting, disclosure and fiduciary requirements."  <u>Id.</u> at 1353.  Furthermore, the court found that the claims procedure was procedurally inadequate "because there was none."  <u>Id.</u>  The court noted that the disclosure requirements of ERISA were vital to the overall statutory scheme, and that ERISA could not function without the employees knowing there was an ERISA plan in the first place or what it said.  <u>Id.</u> at 1354.  In sum, the Ninth Circuit found that the "defendants failed to comply with virtually every applicable mandate of ERISA."  <u>Id.</u> at 1353.  The court found that such serious procedural violations rose to the level such that "they

alter[ed] the substantive relationship between employer and employee,"
and "work[ed] a substantive harm" to the employees.  Id. at 1354.  This
extreme procedural irregularity weighed heavily in the court's decision
to reverse and remand the case back to the district court.  Id. at
1357.

Here, Plaintiff argues that Defendant's failure to issue any
decision on Plaintiff's appeal amounts to a wholesale and flagrant
violation of ERISA's procedural requirements similar to the violations
at issue in Blau, such that de novo review should apply.  Plaintiff
points to the ERISA regulation, which mandates a certain appeals
procedure for ERISA benefits denials.  See 29 C.F.R. § 2560.503-1(h).
The regulation states that "[e]very employee benefit plan shall
establish and maintain a procedure by which a claimant shall have a
reasonable opportunity to appeal and adverse benefit determination to
an appropriate named fiduciary of the plan, and under which there will
be a full and fair review of the claim and the adverse benefit
determination."  Id. § 2560.503-1(h)(1).  The regulation goes on to
detail the procedure that should be provided, which includes the
opportunity to submit written comments, access to documents, and an
additional review that takes into account all additional information
submitted.  Id. § 2560.503-1(h)(2).  Similar procedures are required
for group health plans, which include "a review that does not afford
deference to the initial adverse benefit determination."  Id. §
2560.503-1(h)(3).

While this regulation covering the appeals procedure is certainly
important in ERISA's overall statutory scheme, the Court finds that
Defendant's failure to issue a decision on Plaintiff's appeal is not so

flagrant that it alters the substantive relationship between the employer and employee as was the case in <u>Blau</u>.  In <u>Blau</u>, the failure to disclose the existence of the plan in the first place made it virtually impossible for participants to file a claim or to ensure that the plan administrators were appropriately administering the plan.  By comparison, however, the appeals procedure at issue here is implicated when a participant knows of his or her rights under the plan and has been pursuing them with the requisite diligence.  Furthermore, if a decision is not rendered on the plaintiff's appeal within forty-five days, the participant can file suit in federal court in order to obtain the relief that the plaintiff seeks.  Indeed, this is precisely what Plaintiff did in this case.  Thus, while the failure to issue a decision on Plaintiff's appeal is a serious procedural irregularity, it is not so severe to create a substantive harm to the employee such that de novo review is appropriate.[4]

Furthermore, it cannot be said that Defendant entirely failed to exercise discretion, which would justify applying de novo review.  <u>See</u> <u>Abatie</u>, 458 F.3d at 972.  The plan administrator exercised its

_____

[4] The procedural irregularities involved here are more similar to those at issue in <u>Abatie</u>.  There, the court noted that the defendant had originally denied the plaintiff's claim for a given reason, but then later, in its final decision, added a second reason.  458 F.3d at 974.  The court noted that when "an administrator . . . adds, in its final decision, a new reason for denial, a maneuver that has the effect of insulating the rationale from review, [the administrator] contravenes the purpose of ERISA."  <u>Id.</u>  The court said that such a "procedural violation must be weighed by the district court in deciding whether Alta abused its discretion."  <u>Id.</u>  The procedural irregularity at issue here similarly precluded Plaintiff from obtaining review because Defendant never ruled on Plaintiff's appeal.  Thus, much like the court found in <u>Abatie</u>, this procedural irregularity should be weighed when determining whether Defendant abused its discretion, but it does not justify de novo review.

discretion in denying Plaintiff's original claim.  Even though there has been no decision on appeal, it would be inaccurate to say that the administrator entirely failed to exercise discretion in this case. Because the plan administrator terminated Plaintiff's claim, it therefore is the Court's role to determine whether that initial decision to terminate Plaintiff's long-term benefits was an abuse of discretion.

As discussed above, the court can consider procedural irregularities, much like conflicts of interest, as a factor "to be weighed in deciding whether an administrator's decision was an abuse of discretion." Id. at 972.  The administrator's benefits denial decision should be given "broad deference" if it can be shown that the administrator has engaged in an "ongoing, good faith exchange of information between the administrator and the claimant." Id.  On the other hand, "[a] more serious procedural irregularity may weigh more heavily," and call for greater skepticism of the administrator's denial decision. Id.

In light of the serious procedural irregularities involved here, the Court will apply a large amount of skepticism when reviewing Defendant's decision to terminate Plaintiff's benefits.  The evidence shows that Defendant has not engaged in a good faith exchange of information with Plaintiff.  Plaintiff sent multiple communications to Defendant following the benefits termination decision, and Defendant failed to respond. (See AR, at 312, 313.)  Furthermore, by denying Plaintiff the standard procedures for pursuing an administrative appeal of his claim, Defendants have further shown an unwillingness to engage in a good faith exchange of information.  The appeals process is

designed to facilitate an exchange of information whereby the beneficiary is given the opportunity to submit additional information in support of his or her claim.  See 29 C.F.R. § 2560.503-1(h).  By effectively ignoring Plaintiff's appeal for more than a year, Defendant has shown that it has no desire to engage in such an exchange.  Because of Defendant's actions, and the serious procedural irregularity involved, the Court finds that abuse of discretion, tempered by a large amount of skepticism, is warranted.

When making its review, the Court can consider additional evidence.  See Abatie, 458 F.3d at 973; Saffon v. Wells Fargo & Co. Long Term Disability Plan, 522 F.3d 863, 872 n.2 (9th Cir. 2008).  The goal is to attempt to recreate what the administrative record would have looked like had the appeals procedure been properly followed.  Id. As a result, the Court will consider the additional information that Plaintiff submitted to Defendant in connection with Plaintiff's notice of appeal.

Plaintiff also points to other procedural irregularities, which Plaintiff contends should alter the standard of review.  First, Plaintiff notes that Defendant communicated directly with Dr. Cordero without informing Plaintiff of the communications.  The Ninth Circuit has noted that "[i]f a claims administrator communicates with a doctor who has treated a beneficiary, it must disclose that fact to the patient at a meaningful time."  Saffon, 522 F.3d at 873 n.4.  Thus, the Court will consider this factor and apply even greater skepticism.

Finally, there is evidence that Defendant operates under a structural conflict of interest because it both funds and administers the plan.  See Abatie, 522 F.3d at 867.  Beyond this structural

conflict, however, there is no further evidence of conflict of interest.  Thus, the Court will consider this conflict as well when performing its abuse of discretion review.

**B.  Abuse of Discretion**

Going now to the merits of Plaintiff's case, the issue is whether, when applying an abuse of discretion standard tempered with a large amount of skepticism due to the procedural irregularities involved, Defendant correctly determined that Plaintiff was no longer eligible for benefits.

As an initial matter, there is some dispute between the parties with regard to how the terms of the Plan should be interpreted.  The long-term disability plan that the parties have submitted as part of the record states that monthly disability payments will be paid if an insured is "Totally Disabled" under the plan.  (AR, at 9.)  In the first year of disability, "Total Disability" is defined as "completely unable to do each and every duty of his employment."  (Id. at 7.)  This is known as the "own occupation" standard.  After the first year, "Total Disability" is defined as "completely unable to engage in any occupation for wage or profit for which he is reasonably qualified by training, education, and experience."  (Id.)  This is known as the "any occupation" standard.

The plan also has an "Elimination Period" of one year, which is the time during which the insured is "Totally Disabled," yet no benefits are payable.  (Id.)  Thus, an insured must be "Totally Disabled" for one year before he or she can obtain long-term benefits.

Plaintiff became disabled and filed his claim for benefits in July 2005. (Id. at 311.)  Plaintiff began obtaining benefits nearly immediately.  (See id. at 25.)  Under the long-term plan, as just explained, it would not seem possible for Plaintiff to have received benefits nearly immediately due to the one-year Elimination Period. Defendant explains, however, that Plaintiff was initially receiving benefits under a different short-term policy for the first year.  After the first year, and the expiration of the Elimination Period, in August of 2006, Plaintiff was transferred over to the long-term plan.  Thus, in August 2006, Plaintiff was being paid benefits due to his inability to do his own occupation.

In August of 2007, however, the definition of "Total Disability" changed from "own occupation" to "any occupation" under the long-term plan.  It was a result of this change, Defendant contends, that Defendant began to investigate to determine whether Plaintiff qualified under this new "any occupation" standard.  As part of this investigation, Defendant had Plaintiff examined by Dr. Shorr and Dr. Mason.

Plaintiff disagrees with this version of what happened with Plaintiff's coverage.  Plaintiff contends that he was always covered by the long-term policy and, therefore, that he was being paid for being unable to perform any occupation beginning in August 2006.  This is important to Plaintiff's case, he contends, because in Saffon, the court noted that Ninth Circuit found important the fact that the insurance company had been paying the plaintiff "long-term disability benefits for a year, which suggests that she was already disabled." 522 F.3d at 871.

1   The Court rejects Plaintiff's interpretation, however, because if
2   Plaintiff's interpretation is accurate, then Plaintiff would not have
3   received benefits for the first year under the long-term plan.   The
4   fact that Plaintiff was paid nearly immediately suggests that Plaintiff
5   was being paid under a different short-term plan for the first year and
6   then paid under the long-term plan beginning in August 2006 under an
7   "own occupation" standard.   The standard for eligibility then shifted
8   to "any occupation" in August 2007.

9       In light of the Court's finding that Plaintiff was subject to the
10   "any occupation" standard beginning in August 2007, the question is
11   whether Defendant abused its discretion by finding that Plaintiff was
12   not unable to perform any occupation as of March 2008.   Under
13   traditional abuse of discretion analysis, "[a]n ERISA administrator
14   abuses its discretion only if it (1) renders a decision without
15   explanation, (2) construes provisions of the plan in a way that
16   conflicts with the plain language of the plan, or (3) relies on clearly
17   erroneous findings of fact."   Boyd v. Bert Bell/Pete Rozelle NFL
18   Players Retirement Plan, 410 F.3d 1173, 1178 (9th Cir. 2005).
19   Plaintiff's primary contention appears to be that Defendant's
20   conclusion was based on clearly erroneous findings of fact.   "A finding
21   is 'clearly erroneous' when although there is evidence to support it,
22   the reviewing body on the entire evidence is left with the definite and
23   firm conviction that a mistake has been made."   Id.   A plan
24   administrator's decision to deny benefits should be upheld "'if it is
25   based upon a reasonable interpretation of the plan's terms and was made
26   in good faith.'"   Id. (quoting Estate of Shockley v. Alyeska Pipeline
27   Serv. Co., 130 F.3d 403, 405 (9th Cir. 1997)).   On the other hand, it
28

should be reversed if a review of "the entire record leads to a 'definite and firm conviction that a mistake has been committed.'" Id. at 1179 (quoting Concrete Pipe & Prods. of Cal. Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993)). While this is the traditional abuse of discretion standard, the Court will apply more skepticism in light of the serious procedural irregularities involved.

Defendant's decision to terminate Plaintiff's benefits was based on the reports of Dr. Shorr and Dr. Mason, both of whom said that Plaintiff could perform sedentary work, and thus, was not unable to perform "any occupation." Having closely reviewed the record, the Court finds that Defendant abused its discretion by finding that Plaintiff could perform sedentary work because neither doctor considered the foot and leg pain that Plaintiff was experiencing when the doctors evaluated whether Plaintiff could perform sedentary work. In Dr. Shorr's report, he noted that Plaintiff's "chief complaints" included "[b]ilateral foot pain and edema." (AR, at 454.) Dr. Shorr noted that Plaintiff was "complaining of constant pins-and-needles sensations in both feet. He states that his feet feel cold, worse at night and worse with walking. He also has bilateral foot pain." (Id. at 455.) Dr. Shorr was also aware that five different doctors had treated Plaintiff for foot and/or leg pain. (See id. at 458-466.) Nonetheless, Dr. Shorr's report is completely silent with respect to how much pain Plaintiff was experiencing and whether Plaintiff could perform "any occupation" while experiencing such pain. Dr. Shorr summarily concluded that "[a]t this time, the patient can do only sedentary work, that is, work in a sitting position, requiring the use

1  only of his upper extremities." (Id. at 467.)  Dr. Shorr hedged his

2  conclusion significantly, however, noting that "[a]t this point, there

3  still is no diagnosis and my comments are based only on the physical

4  findings and record review." (Id.)  Dr. Shorr also noted that "[i]t is

5  not clear whether the condition is stable or worsening." (Id. at 466.)

6      Dr. Shorr did not address Plaintiff's "chief complaint" that he

7  was experiencing pain in his feet and legs.  One would expect Dr. Shorr

8  to have discussed this pain and possible treatment options including

9  whether pain medication would have been effective.  Dr. Shorr never

10  addressed these issues however.  In light of his notation that it was

11  unclear whether Plaintiff's condition was stable or worsening, it is

12  incomprehensible how Dr. Shorr reached his conclusion that Plaintiff

13  could perform sedentary work.  In light of the inconclusive nature of

14  Dr. Shorr's report, and the fact that Dr. Shorr did not address

15  Plaintiff's "chief complaint" of foot/leg pain, it was clear error for

16  Defendant rely in Dr. Shorr's report as the basis for terminating

17  Plaintiff's benefits.

18      Defendant argues that Dr. Shorr adequately addressed Plaintiff's

19  complaints of pain in Dr. Shorr's notation that the "patient walks with

20  a cane but rises easily from a chair." (Id. at 458.)  Defendant argues

21  that since Dr. Shorr found that Plaintiff could "rise[] easily from a

22  chair," it was not an abuse of discretion for Defendant to base its

23  termination decision on Dr. Shorr's report.  The Court rejects this

24  argument, however, because this single sentence from Dr. Shorr's report

25  makes no mention of pain.  It is quite conceivable that a person could

26  rise to the standing position and still experience serious pain.  Under

27  these circumstances, where Plaintiff's "chief complaint" was with

28

regard to pain, Defendant should have sought out a specific diagnosis with respect to Plaintiff's foot/leg pain.  A decision to rely solely on the fact that Plaintiff could stand up from a chair as the basis for finding an absence of pain, was an abuse of discretion.

Dr. Mason's report similarly failed to address Plaintiff's complaints of foot and/or leg pain.  Dr. Mason specifically spoke with Dr. Cordero and noted in her report that Dr. Mason told her that Plaintiff "has too much pain to work even at a sedentary job."  (Id. at 471.)  Dr. Cordero also told Dr. Mason that he had concerns regarding Plaintiff's use of pain medication.  (Id.)  Like Dr. Shorr, Dr. Mason also noted Plaintiff's long medical history in which he had consistently reported debilitating foot pain.  (Id. at 471-73.)  Nonetheless, Dr. Mason summarily concluded that Plaintiff could "work in a sedentary position at four hours a day increasing two hours a day every two weeks until he is working at eight hours a day."  (Id. at 474.)  Much like Dr. Shorr, however, Dr. Mason's report does not address Plaintiff's pain, despite the extensive evidence in the record that Plaintiff was experiencing too much pain to work.  Dr. Mason did note that a "Functional Capacity Exam" could be useful in order to determine Plaintiff's full capacity to work.  (Id. at 474.)  No such Functional Capacity Exam was performed, however, before the decision was made to terminate Plaintiff's benefits.  Thus, in light of Dr. Mason's failure to address Plaintiff's foot and/or leg pain, it was clear error for Defendant to terminate Plaintiff's benefits in reliance on Dr. Mason's report.

Because of the procedural irregularities, the Court can also consider additional evidence that Plaintiff submitted in support of his

claim.  One such piece of evidence is the letter written by Dr. Cordero on May 19, 2008.  (Id. at 315.)  In that letter, Dr. Cordero made it quite clear that Plaintiff did not qualify for any type of work, including work performed in a sedentary position, due to the fact that "[h]e suffers from constant leg pain and swelling, which requires elevation of the legs, and narcotic analgesics." (Id.)  Because Defendant never engaged in a meaningful appeals process with Plaintiff, there is no evidence that Defendant ever considered this additional letter from Dr. Cordero.  If Defendant had engaged in the appropriate appeals procedure, perhaps Defendant would have noticed that neither Dr. Shorr nor Dr. Mason had addressed Plaintiff's chief complaint of foot/leg pain.  Defendant could have then forwarded Dr. Cordero's letter to Dr. Shorr and Dr. Mason for consideration, or Defendant could have obtained another medical opinion in order to address this concern. Defendant failed to take any of these steps, however, and instead, completely ignored the additional letter from Dr. Cordero.  In light of this procedural error, Dr. Cordero's letter stands essentially unrefuted by any evidence offered by Defendant in support of the termination decision.

In sum, the Court finds that Defendant abused its discretion by deciding that Defendant was able to perform sedentary work in reliance on the opinions of Dr. Shorr and Dr. Mason, both of whom failed to address Plaintiff's primary complaint of foot/leg pain.  Furthermore, because Defendant completely ignored Plaintiff's appeal, the Court can consider the additional evidence submitted by Dr. Cordero, which states that Plaintiff experiences too much pain to perform sedentary work.  In

1  light of these facts, the Court finds that Defendant's termination
2  decision was an abuse of discretion.

3

4      **C.   Remedy**

5

6      When a plan "administrator terminates continuing benefits as a
7  result of arbitrary and capricious conduct, the claimant should
8  continue receiving benefits until the administrator properly applies
9  the plan's provisions." <u>Pannebecker v. Liberty Life Ins. Co. of
10 Boston</u>, 542 F.3d 1213, 1221 (9th Cir. 2008).  Because Defendant's
11 termination decision was an abuse of discretion, Plaintiff's benefits
12 are reinstated to the date of the denial.

13

14 **IV.   CONCLUSION**

15

16     For the reasons stated above, the Court finds that Defendant
17 abused its discretion by terminating Plaintiff's benefits.
18 Accordingly, the Court enters judgment for Plaintiff and ORDERS
19 Plaintiff's benefits reinstated to the date of denial.  Defendant Motor
20  Car Dealers Services, Inc., has made no appearance and is therefore
21 dismissed for lack of prosecution.

22

IT IS SO ORDERED.
23

24 DATED:   July 27, 2009

25                                          STEPHEN V. WILSON
                                           UNITED STATES DISTRICT JUDGE

26

27

28